SHEARMAN & STERLING LLP
Fredric Sosnick
Sara Coelho
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- X
| | |
|---|---|
| In re: | : Chapter 15 |
| | : |
| **Inversora Eléctrica de Buenos Aires S.A.,**[1] | : Case No. 16-[●] ([●]) |
| | : |
| **Debtor in a Foreign Proceeding.** | : |
| | : |

--------------------------------------------------------------- X

**DECLARATION OF JAIME JAVIER BARBA IN SUPPORT OF (I) VERIFIED
CHAPTER 15 PETITION, (II) FOREIGN REPRESENTATIVE'S MOTION
FOR ORDER GRANTING FINAL RELIEF IN AID OF A FOREIGN
PROCEEDING, AND (III) CERTAIN RELATED RELIEF**

Jaime Javier Barba, a citizen of the Argentine Republic ("**Argentina**") hereby declares, under penalty of perjury under the laws of the United States of America, as follows:

1. I am the authorized foreign representative (the "**Foreign Representative**") for Inversora Eléctrica de Buenos Aires S.A. ("**IEBA**"), the above-captioned debtor (the "**Debtor**"). IEBA is restructuring its obligations pursuant to an *acuerdo preventivo extrajudicial* ("**APE**") under the provisions of Title II, Chapter VII of the Argentine Bankruptcy Law No. 24,522 (as amended) ("**Argentine Bankruptcy Law**") before the National Commercial Court N° 1 sitting in the City of Buenos Aires (the "**Argentine Court**" and, such proceeding, the "**Foreign Proceeding**"). I am fully authorized to act on behalf of the Debtor with respect to the

---

[1] The last four digits of the taxpayer registration number of the Debtor are 078-9. The Debtor's executive headquarters is located at Zenteno 3175, City of Buenos Aires, Argentina.

Foreign Proceeding.

2. I submit this Declaration in support of the: (a) verified chapter 15 petition of the Debtor; (b) the *Foreign Representative's Motion for Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice* (the "**Notice Procedures Motion**"); and (c) the *Foreign Representative's Motion for Order Granting Final Relief in Aid of a Foreign Proceeding* (the "**Recognition and Relief Motion**"). I am an individual over the age of 18 and, if I am called upon to testify, I will testify competently to the facts set forth herein.

3. In my role as Chairman of the Board of IEBA, I have become familiar with the history, day-to-day operations, assets, financial condition, business affairs, and books and records of the Debtor. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other employees, affiliates, officers, or directors of the Debtor, or by professionals retained by me or the Debtor, including, with respect to matters of United States bankruptcy law, information provided to me by United States counsel, Shearman & Sterling LLP and, with respect to matters of Argentine bankruptcy law, information provided to me by Argentine counsel, Errecondo González & Funes Abogados; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

## Background

4. On November 9, 2015, pursuant to that certain "**Solicitation Memorandum**," IEBA, seeking to restructure its Series C Notes and Series D Notes (collectively, and as described in more detail below, the "**Old Notes**"), began soliciting the tender of such notes and sought powers of attorney in order to, *inter alia*, execute an APE (the "**IEBA APE**").

5. The IEBA APE enjoys the overwhelming support of the Debtor's

2

creditors. On December 23, 2015, the Board of Directors of IEBA unanimously resolved to authorize the Foreign Proceeding, and, accordingly, the IEBA APE was filed before the Argentine Court. On May 18, 2016, a meeting of the holders of the Old Notes was held to provide their consent to the IEBA APE proceeding (the "**APE Consent Meeting**"). At the APE Consent Meeting, all parties present in person or by proxy voted in favor of the IEBA APE. As a result, the IEBA APE currently enjoys the support of over 91% of the Old Notes.

6. The deadline to object to homologation or approval of the IEBA APE was May 12, 2016. No party in interest objected, and, on September 8, 2016, the Argentine Court issued an *acuerdo homologado* (endorsement) of the IEBA APE (the "**Homologation Order**").

7. On September 16, 2016, pursuant to a duly authorized resolution (the "**Authorizing Resolution**"), IEBA's board of directors authorized the commencement of this chapter 15 case and appointed me to act as Foreign Representative in this case.

8. Pursuant to the terms of the IEBA APE, the closing of the transactions had to occur within 30 days of the Homologation Order. Separately, the IEBA APE provided that if the IEBA APE had received the consent of holders of more than 90% of the Old Notes, then the transactions could be closed without the requirement of the approval of the IEBA APE. On September 27, 2016, the Debtor informed the Argentine Court that it would be seeking relief pursuant to chapter 15 of the Bankruptcy Code, and that the 30 day period for closing with non-consenting creditors would be tolled pending the request for such relief.

9. On September 26, 2016, IEBA consummated the transactions approved in the IEBA APE with respect to the noteholders who consented to the IEBA APE by making the

3

cash payments and issuing and delivering the notes (the "**New Notes**") required pursuant to the IEBA APE.[2]

10. A copy of the Solicitation Memorandum distributed to holders of the Old Notes is attached hereto as Exhibit A. A copy of the petition commencing the IEBA APE is attached hereto as Exhibit B. Copies of the orders issued by the Argentine Court determining that the conditions for opening the IEBA APE proceeding were met are attached hereto as Exhibit C. A copy of the text of the commencement notice, which was published in the *Wall Street Journal* and four newspapers in Argentina, is attached hereto as Exhibit D. A copy of the minutes of the APE Consent Meeting is attached hereto as Exhibit E. A copy of the Homologation Order is attached hereto as Exhibit F. A copy of the minutes of the board meeting appointing me as the Foreign Representative is attached hereto as Exhibit G. A copy of the notice of the consummation of the transactions contemplated by the IEBA APE proceeding is attached hereto as Exhibit H. A copy of the IEBA APE is attached hereto as Exhibit I. Certificates of translation of each Spanish-language document are attached within the respective Exhibits.

**A.    The Debtor's Business**

11. The Debtor is the Argentine holding company of Empresa Distribuidora de Energía Atlántica S.A. ("**EDEA**"), which operates the distribution and transportation of electricity in the eastern region of the Province of Buenos Aires. The Debtor was formed to acquire EDEA in connection with the privatization of the electricity transmission and distribution services by the Province of Buenos Aires. The Debtor conducts substantially all of its operations

---

[2] A single holder of the Old Notes that holds approximately 1.99% of the Old Notes and voted in favor of the IEBA APE experienced difficulties in effectuating proper instructions to its broker, which are necessary to complete the tender. As a result, the IEBA APE has not yet been consummated with respect to such holder. The exchange with that holder will be completed promptly after the holder properly tenders its Old Notes to the Exchange Agent.

4

through EDEA and its operational and financial results consist mainly of dividends received from EDEA.

12. On June 2, 1997, EDEA was granted an exclusive, 95-year concession for the distribution and marketing of electricity in the eastern region of the Province of Buenos Aires (the "**Concession**") and started its operations. The Concession covers an area of approximately 105,438 square kilometers and with a population of over 1.6 million. Since this region includes many of Argentina's main seaside cities, the population increases significantly during the summer period, reaching an average of 3 million people. EDEA services directly 17 districts in the interior of the Province of Buenos Aires. It has approximately 513,000 customers, of which approximately 90% are residential.

13. Under the Concession, EDEA derives revenue from tariffs charged for the electricity distribution services it provides in the Province of Buenos Aires. The tariffs, which are regulated by Argentine law and by the Concession, only may be adjusted through resolutions issued by the Ministry of Infrastructure of the Province of Buenos Aires, the central regulatory body for the electricity services industry. Although tariffs should be adjusted periodically to reflect variations in the costs of purchasing and transmitting electricity, among other factors, they have not been consistently adjusted for these purposes, as more fully set forth below.

14. The Debtor's center of main interest is located in Argentina. It is operationally and functionally centered in the City of Buenos Aires, where its senior management and its combined cash management and accounting functions are located. Indeed, among other connections to Argentina:

(a) the Debtor's registered office is located at Zenteno 3175, City of Buenos Aires, Argentina;

(b) the Debtor's main asset is its ownership interest in EDEA, an entity located in and organized under the laws of Argentina;

5

(c) EDEA's main assets are transformer stations, substations, overhead and underground distribution networks and energy meters located in the Province of Buenos Aires, Argentina;

(d) all of the Debtor's operations, conducted through EDEA, are managed and directed from offices located in the city of Mar del Plata, Argentina;

(e) corporate governance for the Debtor is directed from the City of Buenos Aires, Argentina;

(f) in-person meetings of the Debtor's Board of Directors are typically held in the City of Buenos Aires, Argentina;

(g) all members of the Debtor's board of directors maintain their offices in Argentina;

(h) strategic and key operating decisions and key policy decisions for the Debtor are made by staff located in the City of Buenos Aires, Argentina;

(i) the Debtor's corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, regulatory, research and development, and tax services are provided from the City of Buenos Aires, Argentina;

(j) the Debtor's finance, legal, human resources, payroll, billing, and other services are carried out in the City of Buenos Aires, Argentina;

(k) the Debtor's cash management functions are maintained and directed from the City of Buenos Aires, Argentina;

(l) key information technology and systems used by the Debtor are provided from Mar del Plata, Argentina;

(m) management and senior staff of the Debtor regularly attend meetings in the Province of Buenos Aires, Argentina;

(n) the chief executive officer that oversees financial management of EDEA is based in Mar del Plata, Argentina; and

(o) all capital expenditure decisions affecting the Debtor are managed in Argentina.

B.   **Connections to the United States**

15.   As set forth above, substantially all of the assets of IEBA, and the

subsidiary through which it operates, are located in Argentina. However, the Debtor currently

6

maintains assets in the United States consisting of property held in accounts located in New York, New York (collectively, the "**U.S. Accounts**").  The U.S. Accounts include an escrow account in New York at Bank of New York Mellon Corporation that exists under a New York law governed escrow agreement to which IEBA is a party.  The escrow account currently contains unclaimed Old Notes that had been issued as part of a previous restructuring and cash interest payments in respect of such unclaimed Old Notes.  IEBA also owns cash located in a bank account at a New York branch of Barclays Bank PLC.  The Debtor is not party to any pending litigation in the United States.

16. In addition, the Debtor is party, as issuer, to that certain indenture (as modified, supplemented, or amended from time to time, the "**Old Notes Indenture**"), dated as of September 26, 2007, which governs the Old Notes exchangeable pursuant to the IEBA APE. Under the terms of the Old Note Indenture, the Old Notes, with limited exceptions, are governed by New York law.  Pursuant to Section 10.19 of the Old Notes Indenture, each of the parties thereto, including the Debtor, submitted to the non-exclusive jurisdiction of any New York state or United States federal court sitting in the Borough of Manhattan in the City of New York, New York.  Therefore, it is my understanding that the Debtor also has significant intangible property interests in the form of contractual rights under the Old Notes Indenture that are located, for legal purposes, in New York.

17. The foregoing assets are the only significant assets of the Debtor in the United States.  Accordingly, New York, New York, is the jurisdiction where the Debtor's principal assets in the United States are located.

C.     **Corporate and Capital Structure**

18. As set forth above, IEBA is the direct parent and holding company for

7

EDEA.  Infraestructura Energética del Plata S.A. ("**IEPSA**") and its subsidiary, Buenos Aires Energy Company S.A.U. ("**BAECO**"), own a controlling stake in IEBA.  The ultimate, indirect parent company of IEBA, IEPSA and BAECO is Disvol Investment S.A.

19.     As of the commencement date of the Foreign Proceeding, the outstanding principal amount of Old Notes (including those held in the Escrow Account), which are issued under two series ("**Series C**" and "**Series D**"), was approximately $130.3 million for Series C, and $4.7 million for Series D.  The Old Notes bear an interest rate of 6.5%.  Only the Old Notes were subject to restructuring pursuant to the IEBA APE; the Debtor's commercial and other obligations remained unchanged by the proceeding.  At the end of the second quarter of 2016, IEBA reported current assets of $123.7 million and current liabilities of $34.3 million.  IEBA's net loss accumulated for the second quarter of 2016 was $286.4 million.

20.     The New Notes have been issued in the form of one or more registered notes, held by the Depository Trust Company (the "**DTC**"), which serves as their central depository.  Neither the Old Notes nor the New Notes are registered under the United States Securities Act of 1933, as amended (the "**Securities Act**").  Instead, the New Notes have been issued and distributed in offshore transactions only to non-United States persons in reliance on Regulation S under the Securities Act.

D.  **Prior Restructuring Actions and Events Leading to the Filing of this Chapter 15 Case**

21.     IEBA's financial difficulties stem from the economic crisis in Argentina in 2002, and governmental responses to the crisis that altered or limited EDEA's ability to adjust tariffs in accordance with costs and a "**Concession Agreement**," governing IEBA's ability to collect tariffs.  In particular, in 2002, the Argentine government passed laws freezing tariffs and voiding Concession Agreement terms that provided for adjustment of tariffs according to

8

consumer and producer price indexes and calculating tariffs in United States dollars before converting them to pesos at the free-market exchange rate. By mid-2003, EDEA's revenues in constant currency dropped by approximately 70%. Subsequent actions by regulatory authorities approved tariff schedules that also did not comply with the Concession Agreement. At the same time, EDEA's cost of operations increased as a result of inflation. Since IEBA depends on dividends from EDEA, IEBA's financial condition was weakened by EDEA's financial woes.

22.     In 2002, IEBA defaulted in the payment of its notes then outstanding, and, on January 12, 2003, it commenced a reorganization proceeding (*concurso preventivo*) (the "**Previous Argentine Proceeding**") under Argentine law. The Old Notes that are subject to the IEBA APE were issued in 2007 pursuant to a restructuring plan that was approved in the Previous Argentine Proceeding.

23.     In 2006, during the course of IEBA's Previous Argentine Proceeding, changes in the provincial regulatory law applicable to EDEA required EDEA to enter into a Memorandum of Understanding (the "**MOU**") with the Ministry of Infrastructure and to amend the Concession Agreement. The MOU defined technical, economic and legal conditions for sustainable electricity distribution and preserving the interests of regulators, customers, and EDEA, and set target economic goals and quality requirements for EDEA. Importantly, it also established a mechanism for periodic and extraordinary tariff reviews that would permit adjustments to the tariffs, including for any mismatches in the cost structure submitted by EDEA.

24.     The applicable regulators in Argentina failed to conduct tariff reviews in accordance with the MOU, and did not adjust tariffs sufficient to achieve the financial metrics contemplated by the MOU. Additional fixed charges have been approved in 2013 and 2014 to

9

raise funds for infrastructure works and maintenance. These charges were not sufficient, however, to allow for cost recognition and revenue adequacy, as required by the MOU.

25. Furthermore, on April 21, 2014, the Province of Buenos Aires entered into an agreement with the Argentine government under which the Province of Buenos Aires adhered to a "**Convergence Program**," whereby it agreed to freeze tariffs in effect as of December 31, 2013. The Convergence Program, and the consequent tariff freeze, remained in effect through December 31, 2015. Pursuant to regulations entered under the Convergence Program, on June 1, 2014, EDEA was required to enter into a Memorandum of Adherence with the Province of Buenos Aires pursuant to which EDEA adhered to and gave its consent to the Convergence Program. The Argentine Government has been granting subsidies to the Province of Buenos Aires pursuant to the Convergence Program in return for frozen tariff schedules, but such subsidies may only be used for the performance of infrastructure works. As a result of the Convergence Program, the Province of Buenos Aires could not approve an increase in the electricity tariffs in effect as of December 31, 2013 until January 1, 2016.

26. As a result of the prolonged time period during which EDEA has been unable to set tariffs in accordance with its cost structure, and the tariff freeze in 2014, EDEA has been unable to pay dividends to IEBA. In turn, IEBA has been unable to make coupon payments on the Old Notes from and including its payment date on December 26, 2014. Accordingly, IEBA sought to restructure the Old Notes, with the overwhelming consent of the owners of the Old Notes, through the IEBA APE proceeding.

10

**E.     The Foreign Proceeding and the IEBA Restructuring Plan**[3]

27.     As outlined above, IEBA is restructuring its obligations pursuant to an APE proceeding.  The IEBA APE comprises a balance-sheet restructuring, predicated on the exchange or cashing out of the Old Notes.  IEBA's restructuring does not affect other creditors, including commercial creditors.

28.     The payment obligations under the Old Notes were not secured by any of the Debtor's assets.  The Old Notes, however, did have the benefit of both: (i) a pledge on a portion of IEBA's shares representing 10.56% of its capital stock and voting rights, granted by BAECO in favor of Banco de Valores S.A., acting in its capacity as collateral agent for holders of the Old Notes (the "**BAECO Pledge**") and (ii) a pledge on a portion of IEBA's shares representing 0.44% of its capital stock and voting rights, granted by Camuzzi Argentina S.A. ("**Camuzzi**") in favor of Banco de Valores S.A., acting in its capacity as collateral agent to secure Camuzzi's guarantee of payments due under the Old Notes.  Moreover, Camuzzi jointly and severally guaranteed the payment of interest under the Old Notes by executing a commercial guarantee (the "**Guarantee**").

29.     IEBA solicited the tender of the Old Notes and sought the powers of attorney pursuant to the Solicitation Memorandum in order to, *inter alia*, (a) participate in the restructuring of the Old Notes in accordance with the IEBA APE pursuant to the Argentine Bankruptcy Law, select a Restructuring Option (as defined below) and execute an APE; (b) attend and vote at any meeting of the holders of the Old Notes called to release (i) the

---

[3]  The summary of certain provisions of the IEBA APE set forth below is provided for the convenience of the Court and other parties, and is qualified in its entirety by the terms of the IEBA APE.  In the event of an inconsistency between the description below and the terms of IEBA APE, the terms of the IEBA APE shall control.

11

BAECO Pledge and (ii) the Camuzzi pledge; and (c) attend any APE Consent Meeting and vote to consent to or confirm the IEBA APE;

  30.  The holders of the Old Notes had the following options under the IEBA APE:

  (i)  Exchange Option: (a) for each $1.00 in nominal value of the Series C Notes properly tendered (and not validly withdrawn), holders will receive $1.00 nominal value of the Series E Notes due 2022, and (b) for each $1.00 in nominal value of the Series D Notes properly tendered (and not validly withdrawn), holders will receive $1.00 nominal value of the Series F Notes due 2022 (such option, the "**Exchange Option**," and such Series E Notes and Series F Notes being the New Notes). Each of the creditors who would select, or would have been allocated to, the Exchange Option would be deemed to have irrevocably waived and relinquished, as applicable, any rights and claims against Camuzzi under the Guarantee. The New Notes will bear interest from December 26, 2014, and no accrued interest will be paid in respect of the Old Notes under the Exchange Option.

  (ii)  Cash Option: for each $1.00 in nominal value of Old Notes properly tendered (and not validly withdrawn), holders will receive a cash payment equal to the sum of $0.43 (the "**Cash Option**") plus the Cash Option Interest (as described below). IEBA intended to cancel $60.0 million of the outstanding principal amount of its Old Notes through the Cash Option (the "**Cash Option Fixed Amount**"), at a total cost, funded by both IEBA and Camuzzi, of $25.8 million plus the Cash Option Interest. In case of over subscription of the Cash Option, the IEBA APE reserved the right, in IEBA's sole discretion, to increase the Cash Option Fixed Amount. Cash Option Interest in respect of the Old Notes will be paid at the rate of 9% per annum as accrued from and after December 26, 2014.

  31.  The New Notes will be secured by:

  (i)  a pledge on a portion of IEBA's shares representing 10.56% of IEBA's capital stock and voting rights, held by BAECO;

  (ii)  a pledge on a portion of IEBA's shares representing 0.44% of IEBA's capital stock and voting rights, held by IEPSA;

  (iii)  a pledge of a portion of the shares in BAECO's capital stock held by IEPSA, which at all times would represent, together with the shares pledged pursuant to paragraphs (i) and (ii) above, a combined direct and indirect ownership interest of 49% of the aggregate equity interest held collectively by BAECO, IEPSA and/or their affiliates in IEBA (including,

12

        without limitation, any shares of IEBA that may be acquired in the future by BAECO, IEPSA and/or their affiliates, pursuant to a public tender offer or otherwise) (the "**New BAECO Pledge**");[4] and

    (iv)    an assignment in trust to a trustee to be appointed by IEBA, for the benefit of the holders of New Notes, of the right to collect dividends, fees (including management fees) or payments due by EDEA to IEBA.

32. Holders of Old Notes who failed to participate in the solicitation, or who were ineligible to participate in the solicitation under applicable securities laws, would receive a combination of the Cash Option and the Exchange Option in consideration for their Old Notes. If, however, there were to be any creditors who are ineligible to be solicited, or who are ineligible to receive New Notes under applicable securities law, such creditors would receive the Cash Amount Option, and will receive the same treatment as other creditors receiving such option. The Debtor does not believe that United States securities laws are applicable to the IEBA APE because the Debtor is not aware of any creditors who are United States persons.

33. IEBA ultimately reached an agreement with creditors holding over 91% of the outstanding defaulted bonds, and the IEBA APE was filed before the Argentine Court on December 23, 2015. On September 8, 2016, the Argentine Court issued the Homologation Order. No party has appealed the Homologation Order, and the time for lodging an appeal has expired.[5]

34. Pursuant to the terms of the IEBA APE, the closing of the transactions had to occur within 30 days of the Homologation Order. Separately, the IEBA APE provided that if the IEBA APE had received the consent of holders of more than 90% of the Old Notes, then the transactions could be closed without the requirement of the approval of the IEBA APE. On

---

[4]     The New BAECO Pledge shall not represent less than 32% nor more than 49% of BAECO's capital stock.

[5]     As described in the Saturnino Jorge Funes Declaration, parties may file a petition seeking to have an APE declared null and void under Section 60 of the Argentine Bankruptcy Law for a period of six months after entry of a homologation order.

September 27, 2016, the Debtor informed the Argentine Court that it would be seeking relief pursuant to chapter 15 of the Bankruptcy Code, and that the 30 day period for closing with non-consenting creditors would be tolled pending the request for such relief.

### Requests for Recognition and Related Relief

35. In connection with the filing of this chapter 15 case, the Debtor filed the Notice Procedures Motion, and the Recognition and Relief Motion. In addition to the facts set forth above, factual bases for relief under each of these motions is set forth below. I believe, after consultation with counsel, that the relief requested in each motion is necessary to ensure the success of the Foreign Proceeding and to properly administer this chapter 15 case.

A.  **Notice Procedures Motion**

36. The Notice Procedures Motion seeks the entry of an order approving (a) the form of notice of the Chapter 15 Petition, the deadline to object to the proposed Final Order (defined below), and the Recognition Hearing, (b) the manner of service of the Recognition Hearing Notice, (c) the manner of service on the Master Service List of any pleadings in this chapter 15 case and (d) granting certain related relief.[6]

37. The Debtor has many creditors, potential creditors, and other parties in interest that received actual notice or notice by publication of the Foreign Proceeding. I believe that many of those parties will need to be provided with notice of the proposed Final Order, the Recognition Objection Deadline, the Recognition Hearing, or other papers filed in this chapter 15 case. Under the facts and circumstances of the Debtor's chapter 15 case, I submit that service of the Recognition Hearing Notice and other papers in the manner proposed in the Notice Procedures Motion will provide parties in interest due and sufficient notice of the relief requested

---

[6] Terms used in this subsection, but not defined in this declaration, shall have the meanings ascribed to them in the Notice Procedures Motion.

14

in the Recognition and Relief Motion, the associated objection deadline and hearing dates, and of any other papers that may be filed in this chapter 15 case.

38. Furthermore, I believe that the Recognition Hearing Notice provides an efficient way for any party receiving such notice to obtain copies of pleadings filed in this chapter 15 case, as it provides an email address that can be used to obtain critical documents including the Recognition and Relief Motion and the proposed Final Order.  Additionally, I believe that service by the Foreign Representative of all pleadings that it files in these cases by United States mail (or, if necessary or expeditious, its foreign equivalent) first class postage prepaid, or in certain cases by email, on the Master Service List, all as described in the Notice Procedures Motion, is an efficient and effective way to provide notice to such key parties in this case.  At the same time, I believe that such proposed procedures will not overburden the Foreign Representative with the significant costs associated with copying and mailing all the various documents filed in its case to the entire matrix of putative creditors and other parties.

39. Accordingly, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtor, its creditors, and other parties in interest.

B.    **Recognition and Relief Motion**

40. Concurrently herewith, the Foreign Representative has filed the Recognition and Relief Motion seeking entry of the Final Order:  (a) granting the Chapter 15 Petition in this chapter 15 case and recognizing the Foreign Proceeding as a foreign main proceeding pursuant to Section 1517 of the Bankruptcy Code, (b) recognizing and enforcing, within the territorial jurisdiction of the United States, the Homologation Order and its endorsement of the IEBA APE, (c) permanently enjoining all parties from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims

15

against the Debtor or its property, and (d) granting such other and further relief as the Court deems just and proper (the "**Final Order**").

41.     As detailed in the Recognition and Relief Motion, I believe that there is a compelling case for recognition of the Foreign Proceeding as a foreign main proceeding. I have been advised by my counsel that the Foreign Proceeding is a "foreign proceeding" and that I am a proper "foreign representative," as those terms are defined in the Bankruptcy Code. I further have been advised that these cases were duly and properly commenced by filing the Chapter 15 Petition accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including: (a) a corporate ownership statement; (b) a list containing the names and addresses of all persons or bodies authorized to administer the Foreign Proceeding of the Debtor; (c) a statement identifying all foreign proceedings with respect to the Debtor that are known to the Foreign Representative; (d) copies of the Homologation Order and the order commencing the IEBA APE, and (e) the Authorizing Resolution.

42.     Recognition and enforcement of the IEBA APE proceeding within the territorial jurisdiction of the United States is of major significance. Indeed, chapter 15 recognition and enforcement would ensure the success of the Foreign Proceeding. A primary purpose of this chapter 15 proceeding is to provide the means through which Bank of New York Mellon Corporation, the Old Notes indenture trustee (the "**Indenture Trustee**"), will recognize the Foreign Proceeding and the cancellation of the Old Notes. It is my understanding that, absent Chapter 15 recognition, the Indenture Trustee will not recognize the terms of the IEBA APE as they relate to the New York governed Old Notes of holders who did not appear in order to vote in favor of the Foreign Proceeding. Recognition and enforcement under chapter 15 also will ensure that no creditors would be able to disrupt the Debtor by potentially seeking in the future

16

to enforce discharged obligations against the Debtor.

43. I can attest that the Foreign Proceeding occurred in Argentina before the Argentine Court. I can further attest that, as set forth in detail in the Recognition and Relief Motion, Argentina is the center of the Debtor's main interests. Among other things, the Debtor maintains its operations, holds nearly all of its assets, and carries out its management functions in Argentina. Therefore, Argentina is clearly ascertainable by third parties as the Debtors' center of main interests.

44. Finally, as described in the Recognition and Relief Motion, and as discussed with counsel, I understand and believe that recognizing the Foreign Proceeding and granting the relief requested therein is consistent with the purpose of chapter 15 of the Bankruptcy Code and the public policy of the United States.

45. Therefore, I believe that the final relief requested in the Recognition and Relief Motion is necessary and appropriate and is in the best interests of the Debtor, its creditors, and other parties in interest.

## Conclusion

46. Based on the foregoing, I believe that the relief being requested at the outset of this chapter 15 case is well-justified, necessary under the circumstances, in the best interest of the Debtor and its creditors, and should be granted.

47. I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief, and that, (a) the copy of the Solicitation Memorandum attached hereto as Exhibit A is a true and correct copy; (b) the copy of the petition commencing the IEBA APE attached hereto as Exhibit B is a true and correct copy; (c) the copies of the orders issued by the Argentine Court determining that the conditions for opening the IEBA APE proceeding were met attached hereto as Exhibit C are true and correct copies of the same as entered by the Argentine Court; (d) the copy of the text of the commencement notice published in the *Wall Street Journal* and four newspapers in Argentina, attached hereto as Exhibit D, is a true and correct copy; (e) the copy of the minutes of the APE Consent Meeting attached hereto as Exhibit E is a true and correct copy; (f) the copy of the Homologation Order attached hereto as Exhibit F is a true and correct copy of the same as entered by the Argentine Court; (g) the copy of the minutes of the board meeting appointing me as foreign representative attached hereto as Exhibit G is a true and correct copy of the same as adopted by the IEBA Board of Directors; (h) the copy of the notice of the consummation of the transactions contemplated by the IEBA APE proceeding attached hereto as Exhibit H is a true and correct copy; and (i) the copy of the IEBA APE attached hereto as Exhibit I is a true and correct copy. A translation in English of each Spanish-language document is attached within the respective Exhibits.

Buenos Aires, Argentina
Dated: October 12, 2016

/s/ *Jaime Javier Barba*
Jaime Javier Barba
Authorized Foreign Representative of the Debtor